Our next case for argument is 23-2434, Bayer v. Mylan. Mr. Crossman, please proceed. Good morning, your honors, and may it please the court, on behalf of Appellant Bayer, we respectfully request that the court reverse the final written decision of the board, and to the extent needed, vacate and remand. I'd like to start with the claim limitation, clinically proven effective. Because the narrow exception under Bristol-Myers Squibb does not apply on this record, and because the Foley reference relied upon by Mylan does not inherently anticipate that limitation, the final written decision of the board must be reversed. I'm confused. How would that result in a reversal? Well, if clinically proven effective is in fact limiting, and not inherently anticipated, the board decided all of the grounds, at a minimum, on clinically proven effective being either non-limiting or inherently anticipated. How do we know what clinically proven effective means? Even if it is in fact a limitation, it's not clear to me that this record is fully developed on what it means to be clinically proven effective. For example, does it require a p-value showing statistical significance? Does it require human testing? Is something, I mean, as we all know, FDA testing involves multiple stages, can be in vitro, in vivo, or in human testing. Each of those are clinical trials, at which point is something clinically proven effective? I don't feel like we have a developed record on this point. I've read everything, all of the expert testimony, so I don't see how we would reverse, because if we decide something's a limitation, don't we have to send it back for some development and argument from the parties on what that limitation means? Certainly, Your Honor, I would agree that if the court were to determine that clinically proven effective is a limitation, and that further development of what that limitation meant should be decided by the first instance by the board, then the decision of the board should be vacated and remanded. Well, I mean, I didn't see a very fulsome argument in your brief, or in any briefs, about what the exact meaning of that term should be. It was like a flyby. I believe we did in our briefing. And by the way, it differed. What you said here on appeal to us about what that term means differed than some of the arguments you made below about what the term differed. Sometimes, you argued that clinically proven effective meant it had to be proven to be better than, or more effective than, the administration of rivaroxaban itself, that this combination had to be more effective than that. On appeal, you seem to have adopted the position that it just means it has to be more effective than, I think, a placebo, though you didn't call it that. Like, so I'm not even sure that you've consistently argued if that was a limitation, exactly what it means. I do believe, Your Honor, that, as we noted in our briefing, the board construed clinically proven effective in the institution decision that it needed to be, the combination therapy needed to be shown to be clinically effective. We, before the board, and referenced that, I believe in our briefing here, that it did need to be shown clinical efficacy in the clinic, meaning in a patient, and that there needed to be a statistically significant improvement relative to the standard of care, which in this case was aspirin given alone, which were the arms of the COMPASS trial. So, if I would submit we did make that argument below, and we did reference that argument here in our briefing, as the construction that we are operating on, I don't think that whatever the construction is, I don't think on this record, the Foley trial can actually inherently anticipate that limitation, because the Foley trial did not disclose the COMPASS trial, it was actually conducted. And so, when you do not actually have the method that was being performed, that supposedly leads to the result in the claim. What supports your argument that clinically proven effective changes how the claim method is performed? So, I would say two things. First of all, as a practical matter, it does change it, because in the prior art, clinically proven, the doses of rivaroxaban and aspirin that had been given were not clinically proven effective. But I will also add that I think the question of whether the limitation changes the manipulative steps of the method is not the dispositive question under this court's decision in Allergan for whether or not a limitation should be deemed, in the body of a claim, should be deemed to be limiting. Allergan looked at the BMS case, as well as the Copaxone case. And the question that that addressed was, was this limitation material to patentability? But this is a method of treatment, and so I want to pick up on Judge Cunningham's point, which is, what does clinically proven effective have to do with the method of administering precise quantities of precise drugs to a particular end? I think that what it does is it shows the distinction between what the claim is, what the invention is, which is that the method was, in fact, clinically proven effective, and the prior art. I will note on this court- No, but the method isn't what was, the method here is administering, a method of reducing myocardial infarction. Whether something was clinically proven effective or not doesn't actually affect whether this does improve myocardial, the reducing risk of myocardial infarction. I mean, what, okay, let me give you a third example, because I think this will be helpful. You might not perceive it as helpful, but I think it will be helpful to me. So instead of clinically proven effective, because I'm worried about clawback, I'm just going to be clear, I'm worried about clawback, do you know what I mean by clawback? I'm not sure I understand. Okay, I'm worried that y'all want to develop a method, Bayer or anyone else, precise dosages, put it out there, and then later come back and say, now I want to claim it, even though it's been in the public domain for a very long time, because I'm going to add in this clinically proven effective language, and that's how I'm going to claw it back from the public domain. I understand. Now you understand my clawback argument? Okay, wait, hold on, hold on. Question's still coming. What if instead of clinically proven effective, what if you said, voted best new drug of 2026? So, wait, wait, administering to the human patient, ribaviraxin and aspirin in amounts that reduce risk, and it's been voted best new drug of 2026, wherein ribaviraxin is administered in an amount equal to two point, you see my point, right? I do, Your Honor. You've just added a thing that isn't really a meaningful limitation in terms of the method of treating myocardial infarction. You've added a descriptor or something. I understand your question, Your Honor, and I think this is where the Allergan case is very instructive, because if you look at the claim there, it was a method of administering a particular pharmaceutical combination wherein the method was as effective as the prior art method and reduced the incidence of side effects as the prior art method. That falls directly into, squarely into this clawback hypothetical, and the court in that circumstance, this court concluded that nevertheless, the language there, the two wherein clauses about efficacy and safety were in fact limiting because they were material to patentability. There could be a future case where there is language clinically proven effective, but on that record, it wasn't determined to be material to patentability for one reason or another, or it could be obvious in that case. There could be, based on the clinical trial, based on the information of the public, that limitation, that method might not be deemed by the POSA to be something that would be unexpectedly clinically proven effective, but that is the record we have here. I don't know that that answers the question, though, because in the case you cite, you're looking at a level of effectiveness. It's got to be better than the prior method, and it's got to not cause a certain downside. If something just wins a prize, as Chief Judge Moore's hypothetical states, that doesn't add anything to the method treatment at all. But I do think, Your Honor, that goes back to Judge Moore's original question, which is how does someone demonstrate clinical proof of efficacy, and to show something is to be clinically proven effective. It has to be shown relative to some standard, which is what happened in the COMPASS trial. So I think for purposes of the case here, that type of a concern is not a reason not to either reverse or vacate the decision of the board. I don't understand. I mean, my concern was clawback. Taking something from the public domain and now patenting it because you've added a descriptive label that isn't at all relevant to the actual method of administration. This is a method of administering claim. Whether it's clinically proven effective or not has no bearing on the method of administering. Well, what I would submit, Your Honor, is that it's not the same method as in the prior art because now, whatever method was being carried on in the prior art, that had not been clinically proven effective. Now there was a method that in fact was clinically proven effective, and that should allow the distinction again under the Allergan case. But if I... Let me just do kind of an add-on or a similar hypothetical to what the Chief started you with. So what if you filed another patent today, okay, with the limitation as proven clinically effective in a study started on May 6, 2025? Can you get 20 more years of patent protection? What I would suggest in that, Your Honor, is the answer is no, because in that case, it's hard to see how that particular limitation would be material to patentability or have anything to do with the allowance, the novelty of the non-obviousness of the claim. However, in a circumstance where it does, which it clearly does here, which was the case in the Allergan, and that's also the case in how it's distinguished compact zone, such a limitation as we have in these claims would be material to patentability. I would like just before, while there's time to also address some of the other claims, because even if this court were to determine that clinically proven effective is either non-limiting or is not inherently, or is inherently anticipated, I don't think that addresses claims three through eight. And let me start at least with claims... Sorry. Three through eight. Because I don't believe it addresses claims three and four because of the combination of Foley and Plotzker, and I don't believe it addresses five through eight for the first product reason, as well as six and seven for the other. Before you do this, I just wanted to tease out one point on Foley. You said it didn't inherently disclose this effectiveness because, and it seems like the main distinction you have is that there's a different number of individuals in the trial. How is that enough to take away the inherent disclosure in Foley? Why is that so important? Because a clinical trial needs to be sufficiently powered in order to demonstrate the results, the statistics. P-value. You get statistical significance. Correct, correct. Which the patent talks extensively about. Small population won't give you a reliable P-value. Correct, correct. That's your idea? And the patent talks extensively about confidence intervals and statistical significance, all hazard ratios, all of that, which goes to the statistical analysis as to whether something is clinically proven effective or not. So if Foley didn't have the right number of patients, then it couldn't disclose efficacy, even if a clinical trial could. Assuming a clinical trial could disclose that, Foley's the wrong reference to rely on. So you're packing a lot into clinically proven effective. Clinically proven effective means it's gotta be proven with a significant statistical value. Yes, and that is what we argued for the board, and we note that argument here in our briefing. But on claims three and four, the ground that Milan raised was Plotzker and Foley in combination. The arguments that it presented in its petition were about Foley and Plotzker in combination. The board in the institution decision said the salient question here is whether the POSA would have a reason to combine Foley and Plotzker with a reasonable expectation of success. However, then in its final written decision, it avoided that question and decided Foley in combination with commercial dosages of aspirin. And the only discussion of commercial dosages of aspirin in the petition was a single sentence buried in the discussion about the combination of Foley and Plotzker, which in part referenced our own patent. And I would submit, Your Honors, that the fact that the board- I think your problem is the board found persuasive Dr. Zussman's explanation that a skilled artisan would have this good reason to modify Foley's 100 milligram aspirin with Plotzker's 75 to 100 milligram because Plotzker not only teaches such a dosage regime, but also teaches its success in reducing the risk of myocardial infarction. So, I mean, why isn't that a motivation? Well, what the board in its decision said was that the POSA would have a reason to modify Foley because the dosages of 75 milligram and 81 milligrams of aspirin were publicly available and Plotzker is consistent with that. But that's not answering the question, I don't think the board addressed in its final written decision, why the POSA would have had a reason to be looking at Plotzker in the first place because Foley and Plotzker addressed two different clinical trials, COMPASS and ATLAS, directed to two different groups of patients. The problem with that is that's a fact argument. You're weighing facts, you're pointing out reasons that maybe that statement ought not to be a motivation to combine, but that's a fact question we review for substantial evidence. So you're up against a hard challenge. You're almost out of time and I really want to give you enough time to address the other issues. Why don't you turn to first product? Okay, I believe that's a legal issue because I believe the board didn't address the correct standard. But moving on to first product. The board, Mylan proposed a construction of first product whereby a first product comprising A and B is actually not a first product comprising A and B. It can be two separate products given around the same time. And it proposed a construction for first product that allowed rivaroxaban aspirin to be given around the same time. Okay, just help me understand something because I get this argument. A first product that is the rivaroxaban and aspirin, does that have to be encapsulated in a single capsule or can it just be take, you know, here, take these two pills but you have to take them at the same time? I think a first product has to have the two in the same product. I mean, that's from the language a first product comprising. And the only place the specification speaks of a product is when it talks about a pharmaceutical product containing all the components along with additional pharmaceutical excipients. But the specification describes it as a combination dosage, right? The specification talks about a pharmaceutical product. It also talks about a combination dosage. And when it refers to a single pill that has both components in it, it calls that a combination dosage. But it does, Your Honor. And then also in column 12, it talks about a pharmaceutical product containing rivaroxaban aspirin and other in a single form. So, but either way, even whether... Are you arguing that the patentee defined product other than its ordinary meaning? Well, I think the ordinary meaning of product, I don't think there's a different definition from the ordinary meaning. But I don't think a product could be satisfied by what Mylan argued is that one could give rivaroxaban and aspirin separately at the same time and that satisfies the first product. What about the blister pack idea? So this was what Mylan argued later was not that O fully discloses a blister pack that contains all three. And by the way, all three wouldn't satisfy the limitation either because it needs to be a first product with rivaroxaban and aspirin and then a second product with rivaroxaban. So you really need two packs under the pack theory. But Mylan never argued that fully disclosed any of that. Mylan's argument was fully supported by giving these two agents at the same time as long as they were given closely together. We disputed the claim construction they proposed to accept that and they doubled down on their claim construction. Okay, so just to confirm and I think it follows up on Judge Scarzi's questioning. You're not contending any lexicography with respect to first product, is that right? We're not. And then what would you say is your best intrinsic support for what you think first product means? You point us to column 12, do you have a line number as well? Sure, yes. It is column 12. Line, I'm sorry, I'm going to need my reading glasses for this. Line 40, the paragraph beginning line 43. In one embodiment, the venture concerns a safe and effective pharmaceutical product, et cetera, et cetera, et cetera. Wherein the pharmaceutical product comprises 2.5 milligram rivaroxaban and- You said line 43, is that right? Yes, correct. Okay, I'm going to ask you a really stupid question now. When we talk about separate dosage forms versus combined dosage forms, can you help me understand, is a combined dosage form always mean in the same capsule or can a combined dosage form mean two pills given at the same time? So that you're receiving both of them. I'm just trying to understand, I don't know- I don't think a combined dosage form would encompass the latter of your two hypotheticals. I don't think if you hand someone two pills, that is a first product comprising A and B just based on the plain language of a first product comprising A and B. There has to be a single product that comprises the two A and B, which we believe in this circumstance is a pharmaceutical product. It could be literally mixed up in a pill, it could be a capsule that contained two different pills within it. It could be, even taking Mylan's hypothetical, which they didn't even really run, is how fully disclosed it, but a pack that just had Riveroxman and Aspirin and there was some second pack for the second product. None of that has to do with, oh, here's Riveroxman and Aspirin in two separate pills, but my hand is somehow the product. So just to kind of sum up, let's say we disagree with you on the arguments you're making with respect to clinically proven effective, but agree with you on your first product arguments. What do you contend would need to be done in terms of the relief granted? So I think for claims five through eight, those would need to be reversed because I don't think there was any evidence to support under the construction that Mylan proffered, or I'm sorry, under the correct construction of first product, I don't think Mylan proffered evidence to satisfy that correct construction, and therefore that would need to be reversed. The case would need to be, I suppose, remanded for a further consideration of grounds one and two, which were not decided by the board in light of five and eight and I would also submit again that I think that even if clinically proven effective were decided in Mylan's favor, that claims three and four, because the board did not conduct the correct analysis that was necessary under that ground, looking at the combination of Foley and Plotzker and looked instead at Foley on its own, that that should be at a minimum reversed, but certainly if the court is remanding for consideration of grounds one and two, could remand it to the board to say, why don't you make some findings as to whether the postal would have had a reason to combine Foley and Plotzker with a reasonable expectation of success as was proposed by Mylan and argued before the board. Okay, thank you, Mr. Grossman. Let's hear from, also how do I say your name? Ms. Devine. Ms. Devine, that's what I thought it was gonna be. May it please the court, Wendy Devine. If I could just answer your honor's question about combinations with reference to the specification of the 310 patent. The 310 patent actually tells us what in the scope of this patent is a combination at column nine, line nine. It defines combination. It says, combinations means, for the purpose of this invention, not only dosage forms which comprise all the components, so called fixed dose combinations, which is what Bayer contends is a first dose, a fixed dose combination. But it goes on to say it also includes combination packs or kits which comprise the components separate from one another but in a single package. It goes on and says later, and this is the part cited by the board, it also includes components administered simultaneously or sequentially as long as they are employed for prophylaxis and or treatment of the same disease. Okay, so that is excellent. I'm really glad you pointed me right to that. That's very helpful. And I'm sure on rebuttal, he's gonna have some answer to that because he needs one. But can you tell me now how that language links up with first product? Because I'm not positive I see that the first product can be a combination dosage. First product seems to me, if we're not giving it lexicography, I think of that as a product, i.e. a single thing. Sure. First product versus a second product. So I tend to think that he's right that unless you show me something in the specification otherwise, I think a first product has to be a capsule or a caplet or a pill that has those two things combined in it. Sure. And so I'm not sure. I totally see what you're saying about column nine. And when I'm trying to figure out what the words combination dosage mean, I think the patented did define, you're right. But I'm not sure that is equated to first product in the spec.  And the spec does not actually define first product. What it does is it talks about products of the invention and then it talks about the therapeutic impact of the invention. And then it says one thing you can do is combination therapy. And if you look at claim five versus claim one, what claim one says is that you're administering the rivaroxaban twice daily and you're administering the aspirin once daily. And that one doesn't have a limitation in it about whether it needs to be in one product versus two products. Right, right. So from a claim differentiation perspective, if you then look at claim five, what it says is that the rivaroxaban and the aspirin come together as a first product. And then there's another dose of rivaroxaban separately as a second product. So putting that in the context of the specification, what you have is combination therapy. The only thing- No, no, no, I don't think that's right. I mean, I think it says in a first product. So I think we have to give those words first product meaning. So I'm not sure, you've got to show me where in the specification I am supposed to derive that that means combination therapy as defined in claim nine. That's what you're missing. I feel like you're reading out the words first product. Sure, so if I can come at this from a slightly different angle. A first product, A meaning one or more. So one or more products that has these two drugs in them. The specification- No, it doesn't mean one or more products. It says a first product as compared to a second product. So I, yeah, I think, I don't know what you- So it only has the two APIs in it, right? And it doesn't say one pill. It doesn't say one dosage form. It doesn't say a combination dosage form. It does not- What is your response to opposing counsel pointing us to column 12 beginning at around line 43? So that was where opposing counsel said we should look to further understand what first product means. How do you respond to that? Sure, so the only thing that that portion of the specification says is that it's an invention that concerns a safe and effective pharmaceutical product for this particular purpose, wherein the pharmaceutical product comprises these two active ingredients in this amount. It doesn't say it's a combination dosage form. It doesn't specify the dosage form at all. So it doesn't shed any further light than the actual language of the claim. But if I could just address counsel's contention that we did not develop the record in response to this construction, that's not accurate. I don't know. I don't want you to miss whether the record's developed. I wanted to- You're losing on this point. I don't know if you perceive that. And so I want you to continue drilling down on it. The pharmaceutical product. I don't know how that could, the pharmaceutical product. I don't know how that can be multiple pills. If I could just talk about the record for just a moment, this claim construction issue actually doesn't impact the ultimate outcome. Because Bayer did not develop any evidence that this claim construction leads to a different result, and we did. But the board hasn't addressed that evidence, and that would, it seemed to me, be a factual question, not a legal question.  So I don't know how that helps you. I guess maybe it helps you because you say then we would vacate, not reverse. And if you vacated and remanded, the only evidence before the board supports invalidity. There is no evidence to support that this construction leads to a different conclusion by the board. I mean, did you, are you thinking I'm gonna make that decision in the first instance? No, I'm not asking Your Honor to make a factual decision. Okay. Okay, so are you just crying uncle on this one? No, I'm not. I still think that there are constant open folds. If I could go back to column nine. If I could go back to column nine. I understand Your Honor is focused on the language specifically first product, which isn't called out in column nine. But column nine is the only place in the specification that talks about combining therapies together. And it is deliberately expansive in how those therapies are combined together. It says that it includes any possible way of giving those therapies together, including simultaneous administration. Just following up on what Chief Judge Moore asked you, I'm not seeing the link between combinations and first product that you're, I think, arguing for. Is there anything else that you can show us to allow me to maybe see the link you're arguing for? Sure, it's just the actual text of the claim. So first product. Okay, I'm with you on the text of the claim. But I don't think it supports what you're saying. But go ahead. So first product is not defined at all in the specification. The claim chose to use language that is not defined in the specification. But what the claim goes on to say is that first product has two drugs in it. And those are given in combination. And then the second product is given a single drug. So if we look for what does the specification say is a combination therapy? How are drugs given in combination? The only place that is discussed, it begins at the bottom of column eight, and it goes to column nine. And it is expansive. It says that you can give them as a single dosage form. It says that you can give them as a combined dosage form. But I'm looking at claim five, and I'm not seeing the word combination. I don't know if it's just because I'm tired. But could you look at claim five and show me? Yes, claim five does not contain literally the word combination, but it does say two different drugs together. A combination of drugs would be the plain and ordinary meaning of that. Okay, so you are importing the word combination to claim five. I'm not seeing it. You don't see it either, right? When we both look at it. It's that literal world is not there. Okay, thank you. I agree. Why don't you move on to one of your other arguments? Sure, I just wanted to make one last point. The board did find in the final written decision that Bayer had waived any arguments related to application of their claim construction by not separately arguing these claims. Moving to clinically proven effective. One thing that I want to level set on clinically proven effective is that the claim language is amounts that are clinically proven effective. And then there is a where in clause that specifies what those amounts are. And what the board found is supported by the literal language of the claims, which is that the amounts that are specified later define the scope of the claim. And that is all that is covered by the claim. In order to get to the argument you made in briefing, we have to read proven out of the phrase clinically proven effective, correct? No, your honor, you do not need to read it out. You do not need to read it out. Proven, the past tense proven, just simply indicates that the treatment has been characterized through a clinical trial. And this court actually faced a very similar situation in the titanium metals case. In titanium metals, there was a claim to an alloy that was characterized by corrosive resistance in certain hot brine circumstances. And this court found that that characterization, that functional description of the claimed prior art composition did not confer novelty. The same thing applies here. It's a characterization of how this, certain clinical endpoints were met that were set by Bayer in their clinical trial. But I guess what I'm wondering is what would be the difference in claim scope if the claim read clinically effective as opposed to clinically proven effective? In this particular claim, it would not make a difference because it is amounts clinically effective, amounts clinically proven effective. And then it tells you that those amounts are 2.5 and 75 to 100. So it doesn't further limit those 2.5 and 75 to 100. It doesn't change the scope of those amounts. And it's undisputed that those amounts are in the prior art. So your argument is that proven adds nothing to the claim. The word proven. To the actual limits of the claim, it does not. Are we reading out of the claim though? No, it's simply a broader limitation followed by a more narrow limitation. And we see claims written like that all the time. It's not negating. But does it have to already be proven effective? Like, so for example, could Bayer have filed this claim before they undertook any clinical trials? A clinical trial isn't required for patentability. So once they knew that this method, and to your Honor's point earlier about Clawback, once they knew this method had promise, they could have filed their patent application. They chose not to. They chose to publish it. And they dedicated it to the public. And then once their clinical trial was done, they filed a patent out. Time out now. When you say they chose to publish it, doesn't the FDA require publication of clinical trials? Sure. And they could have filed their patent application before FDA made that requirement. But they chose not to. But wouldn't you here be arguing that they didn't have a reasonable expectation of success at that point? I mean, wouldn't you now be challenging the utility of their claim if they had done that? Well, here we're talking about anticipation. So we don't need to address reasonable expectation. I don't need to address the consequences of the rule of law you want me to adopt about this not having any meaning? Oh, for... I'm sorry, I don't understand your question, Your Honor. You want me to say clinically proven effective has no meaning in this claim, okay? But if I say that has no meaning, then I guess theoretically I'm creating a universe where they have to file claims before they know that those claims are gonna be effective, potentially effective in reducing the risk of myocardial infarction. So we don't think that such a per se rule is necessary here. What this claim covers is amounts that are clinically proven effective and specification of those amounts. And those amounts and this entire method was published well before the priority date of the patent. So... Well, no, what was published was the onset of a clinical trial. The results of the clinical trial weren't published. Right, and the claim doesn't cover the results of the clinical trial. The claim covers a method of treating this particular affliction. Wait a minute. No, if the words clinically proven effective have meaning, the word proven, you can't actually have that be a claim limitation until you've actually proven that they're effective. Not that I hope they're gonna be effective. I'm preparing to see if they're effective. I'm in the process of determining if they're effective. Right, but what that is, is an inherent property of these particular doses. When that was dosed before the patent and when that was dosed after the patent, that dosage, that method is the same. The impact of that method is the same. The only thing that was happening in between those two times was the characterization of the impact of that method. And under titanium metals, that characterization doesn't confer novelty or patentability. It's simply identifying a property of a prior art method. I don't understand the inherent anticipation argument. Can you try and explain it to me again? Sure, so the claim itself is amounts clinically proven effective. Then it goes on and says, where in those amounts are 2.5 milligrams or 75 to 100 milligrams for rivaroxaban and aspirin, respectively. Isn't it possible that somebody could attempt a clinical trial with those amounts and it would not, in fact, be effective? That it's possible that a clinical trial could fail is absolutely true, but it's not relevant in the scope of this claim. In titanium metals. If it's positive, doesn't inherent anticipation require it's always the case? Always the case, every time? Absolutely, and it is always the case that this trial that was run would have met it's clinical endpoints regardless of the time period when it was run. How do you know that? How do you know what the population was gonna be? How do you know what the p-value was gonna be? What if you had a bunch of elderly people that had a greater predisposition and then it wouldn't have had a p-value that showed statistical significance? I don't know. How can you be sure? I mean, there's so many variables that go into a clinical trial. Absolutely, but the fact of the matter is the only thing that is covered by this claim is giving a patient these two doses of these two medications. And if it had any impact today, it was going to have that same impact before the priority date. You're reading proven out of the claim, though, because I can see your argument that clinically effective might be inherent. You know, it either works or it doesn't work, and that's inherent in the actual dosages itself. But proven effective is a different story. So, in other words, if someone hadn't run the clinical trial, this would have never been clinically proven effective, correct? It wouldn't have been characterized, but it still would have had that. Would have had effectiveness, but it wouldn't have proven effectiveness, correct? Right, and the difference between this case and Allergan, which is where that was the outcome of the case, is there it was a where-in clause that characterized the method. Here, we're talking about clinically proven effective amounts. We're talking about specific amounts. We're not talking about, hey, you can have a composition that can have a bunch of different things in it, and we're characterizing it by its safety and efficacy. We're talking about what happens when you give a person 2.5 milligrams of rivaroxaban and 100 milligrams of aspirin. It was the same five years ago as it's going to be tomorrow. So let me ask a question just hypothetically. So someone could run another clinical trial on different dosages, and that method wouldn't infringe this claim because the dosages are different. The dosages are different. What if somebody ran another clinical trial that disproved the first clinical trial? Then taking these dosages wouldn't infringe the claim, correct? If somebody ran a different clinical trial that didn't meet a different clinical endpoint? So let's say somebody runs a new trial and determines in that new trial that the first trial was somehow at fault, or it somehow discovered that the first trial was faulty, wrong data, glitch, something happened, and this is no longer proven clinically effective. Well, then taking the dosages wouldn't infringe the claim, correct? I would take that back to the titanium metals case where it was a corrosion resistance in a hot brine environment. You could run that hot brine environment in less hot, more hot, less salt, more salt. That's the point. It's a functional characteristic of a composition claim limitation. Here we're talking about 2.5 milligrams of rivaroxaban is 2.5 milligrams of rivaroxaban no matter how you characterize it in the film. Can I ask you, you haven't addressed the Allergan case, and it's really important, and it's probably your biggest hurdle in this case. So can you jump to that and tell me how we would distinguish Allergan? Sure, the key difference between Allergan and the present case is the claim language. So in Allergan, it's a method of treating a patient with glaucoma or ocular hypertension comprising in that method topical administration of a composition comprising, and it lays out some of the elements of the composition. And then there's a wear-in clause about efficacy and a wear-in clause about side effect profile. Here again, we have administration of 2.5 milligrams and 100 milligrams. That is the same claim language that you see in BMS, which is the case that the board applied. In BMS, the claim language was administering to a patient an antineoplastically effective amount of about 135 to 175 milligrams. There, the antineoplastically effective amount applied to specific milligram amounts. That's our case here. In Allergan, that was not the claim language. In BMS, that language, the antineoplastically effective amount was not further limiting on the milligram amount. That's the case here. Following up on what Judge Scarzi's been asking you, I think in BMS, it doesn't have, for example, the comparable word proven. How do you say that it's precisely our case here if we have the additional language of proven? Or tell me what you think about that. Sure. Antineoplastically effective amount in BMS was indicating that it had some sort of therapeutic impact on cancer. Here, we're saying it has some sort of therapeutic effect on heart disease or preventing stroke or heart attack. It's absolutely analogous. The fact that it says proven just indicates that they did the characterization of the functional aspect of what they're trying to claim and pull back out of the priority. If your honors have no further questions, I see you. Okay. Three minutes. Mike, thanks. Okay, so a few points. First of all, on the inherency question, here, the uncontroverted expert testimony, including from Mylan's expert, was that proof of efficacy in a clinical trial is not inherent. That's at a minimum. But again, the Foley reference that Mylan relied upon did not actually disclose the clinical trial as it was conducted that provided the clinical proof of efficacy. So for purposes of a PTAB appeal, where Mylan relied on a specific reference that didn't actually demonstrate that, they haven't proven inherency for purposes of the PTAB proceedings. I'll also add that on Chief Judge Moore's question about publishing the results, this was, in fact, a case where the information was required to be put on clinicaltrials.gov. And if you look at Foley, that's not a buyer publication. That footnote 72 cites to clinicaltrials.gov. So that is one aspect of sort of whether this is truly voluntarily putting something out and clawing it back. You're voluntarily putting it out. That's a stupid argument. That being, I mean, you had the power. You could have filed a patent application promptly. You could have filed your patent application in order so as not to have your own publication become prior art. As Your Honor observed, 112 is a backstop on that because had they done that, they wouldn't have been able to say this is clinically proven effective, which is what they claimed. They couldn't claim something was clinically proven effective until the trial was actually completed and they had that data to prove it. I just don't understand this clinically proven effective. I don't understand how this is any different than safest car on the road voted in 2026 for my Land Rover. Like, I just don't understand how it isn't a superlative in a lot of ways that could be added to every claim to allow people to claw back things that are in the prior art and this is bothering me because you used clinically proven effective and yes, that sounds science-y, wow. You know, but you could have used any superlative. As I said, Your Honor, I believe that that goes back to this question of material to patentability and something just about like best clinical trial of 2022 I don't think would fall into that category. Why? Because I couldn't imagine an examiner looking at that and saying how does that language have anything to do with an invention whereas here clinically proven effective was in fact relied on by both the applicant and the examiner. It's a particular set of facts that Allergan looked at specifically to distinguish BMS and Capaxone and is relevant I think here to the patentability of that limitation. Yeah, what's your best argument that it was important to the patentability in the prosecution history? Because that's Allergan. So what is your best argument that this parallels Allergan from the prosecution history? I just want you to point me to the prosecution history and what you think is the strongest argument that clinically proven effective was necessary to secure the claims. If you look at in the supplemental examination in the appendix 3541 to 3542, that is where the board said the prior art does not disclose the results of the clinical trial and that's why there's no substantial new question of patentability here. And we actually argued that in our supplemental examination petition at appendix 3221 to 3222. I'm at 3541. Where are you at 3541? At 3541. You're looking at the very bottom of the page? The very bottom of the page, the carryover. Yes, none of the items of information discloses information regarding the efficacy of the claimed treatment methods, i.e. results of the clinical trial which was available prior to the critical date. Therefore, none of the items of information raises a substantial new question of patentability. And the items of information were in fact those clinicaltrial.gov printouts disclosing the method of the clinical trial. So, and if one were to look back earlier at the other side, I gave, again, appendix 321 to 3222. Those are arguments that then the supplemental examination unit is responding to in that regard. Also, just so the court has in front of it some other citations on this questions of claims three and four. No, no, your time's up. You've more than extended your time. I've been gracious and gave you a lot of time back. We're not gonna move on to a different point at this point. So, thank you very much. This case is taken under submission.